# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| KEVIN CAPONE and STEVEN SCHEINMAN, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 11687-VCG |
| LDH MANAGEMENT HOLDINGS LLC, LDHMH MM, LLC, CASTLETON COMMODITIES INTERNATIONAL LLC (f/k/a LOUIS DREYFUS HIGHBRIDGE ENERGY LLC), TODD BUILIONE, GLENN DUBIN, GEORGE FERRIS, WILLIAM C. REED II, and JACQUES VEYRAT, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 13, 2018
Date Decided: April 25, 2018

Daniel A. Dreisbach and Ryan P. Durkin, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Brendan V. Sullivan, Jr., Stephen L. Urbanczyk, Paul Mogin, Steven M. Cady, and Matthew H. Blumenstein, of WILLIAMS & CONNOLLY LLP, Washington, DC, *Attorneys for Plaintiffs*.

Donald J. Wolfe, Jr., T. Brad Davey, and Seth R. Tangman, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Andrew Ditchfield, David B. Toscano, Edward Fu, and Sagar D. Thakur, of DAVIS POLK & WARDWELL LLP, New York, New York, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

This matter raises a discrete question under our LLC Act. The Plaintiffs were unitholders in an LLC. Their equity was subject to a call, which the company made. Contractually, the units were to be redeemed at a price derived from the value of the LLC's parent, as of the end of the preceding year. In making that valuation, the Defendants—including directors and officers of the company and its parent—were contractually required to act in good faith. The Defendants made the valuation using information available as of the valuation date. After that date, however, but before the valuation, a portion of the parent entity was sold for a price that suggested that the valuation was grossly insufficient. One of the Plaintiffs made this precise complaint to the Defendants shortly after the call was exercised. Subsequently, but before the statute of limitations on the Plaintiffs' claims had run, the LLC (and its managing member, another LLC) were dissolved, and their assets were distributed to the equity holders. Under the LLC Act, the dissolving entity must set aside a reserve to satisfy, among other things, known claims. The amount of the reserve must be reasonably likely to be sufficient to these ends. The Defendants, however, failed to set aside a reserve for the Plaintiffs' claims (or, looked at another way, set a reserve of zero dollars). The Plaintiffs allege that the zero-dollar reserve was not reasonably sufficient to their claims, and ask me to nullify the certificates of cancellation so that they may proceed with these claims, currently pending in a court in New York.

1

Because I determine that the dissolutions violated the requirement that a reasonable reserve be created to address known claims, I grant the relief the Plaintiffs seek here. My reasoning follows.

## I. BACKGROUND

### A. *The Parties*

Defendant Castleton Commodities International LLC, formerly known as Louis Dreyfus Highbridge Energy LLC ("LDH"), is a Delaware limited liability company.[1] Castleton is a commodities trading company, and its principal place of business is in Stamford, Connecticut.[2]

Defendants Todd Builione, Glenn Dubin, George Ferris, William C. Reed II, and Jacques Veyrat served on the LDH Board of Directors at all relevant times.[3] Reed also served as LDH's President and CEO, and Ferris was its CFO.[4]

In 2009, LDH formed Defendant LDH Management Holdings LLC ("Management Holdings"), a Delaware limited liability company.[5] As part of an employee equity incentive plan, Management Holdings held a fifteen-percent profits interest in LDH.[6] Pursuant to the plan, LDH granted high-level employees membership interests in Management Holdings; those interests were referred to as

---

[1] Compl. ¶ 18.
[2] *Id.* ¶¶ 4, 18.
[3] *Id.* ¶¶ 19–23.
[4] *Id.* ¶¶ 21–22.
[5] *Id.* ¶ 16.
[6] *Id.* ¶ 4; Cady Aff. Ex. 1, § 1.3.

2

"Units."[7]  LDH created another entity, Defendant LDHMH MM LLC ("Managing Member"), to serve as Management Holdings' managing member.[8]  Managing Member was a wholly owned subsidiary of LDH.[9]  I refer to Management Holdings and Managing Member as the "LLCs."

Before his termination from LDH in January 2011, Plaintiff Kevin Capone served as the company's head trader.[10]  Plaintiff Steven Scheinman was fired from LDH in December 2010, though his termination became effective in January 2011; before then, he was the company's General Counsel, Executive Vice President, Chief Compliance Officer, and Corporate Secretary.[11]  Both Capone and Scheinman held Units in Management Holdings under LDH's equity incentive plan.[12]  Specifically, Capone held fifteen Units, representing 10% of Management Holdings' outstanding Units, and Scheinman owned seven Units, representing 4.67% of the outstanding Units.[13]  These equity interests gave Capone and Scheinman an indirect profits interest in LDH of 1.5% and 0.7%, respectively.

---

[7] Compl. ¶ 4.
[8] Cady Aff. Ex. 1, at 9.
[9] *Id.*
[10] Compl. ¶ 14; Cady Aff. Ex. 42, at 54:18–20.
[11] Compl. ¶ 15; Cady Aff. 48, at 6:5–7.
[12] Cady Aff. Ex. 29, at CCIDEL_00004956.
[13] Compl. ¶ 5; Cady Aff. Ex. 29, at CCIDEL_00004956.

*B. Factual Background*

### 1. The LLC Agreement

The underlying dispute in this case turns on the interpretation of several related provisions of Management Holdings' LLC agreement. When Capone and Scheinman were awarded their Units, they signed Unit Award Agreements that bound them to the LLC agreement.[14] Under the LLC agreement, Management Holdings had the right to redeem the Units of any LDH employee who was terminated without cause.[15] This call right was required to be exercised at "the Fair Market Value for such Unit as of the last day of the last Fiscal Year preceding the Fiscal Year in which the Call Notice is given."[16] Management Holdings redeemed Capone and Scheinman's Units on April 12, 2011, several months after they were fired.[17] Thus, the relevant "as of" date for determining those Units' fair market value was December 31, 2010.

The LLC agreement provided the following definition of fair market value:

"Fair Market Value" shall mean, with respect to a Unit of a particular Series, the amount that would be distributed as of any relevant date if (x) all of the assets of LDH and its subsidiaries had been sold at their Gross Asset Value (adjusted immediately prior to such deemed sale by the [Management Holdings] Board in good faith and in consultation with the LDH Board), (y) the net proceeds of such sale (after payment of any liabilities of LDH and its subsidiaries other than any liabilities of LDH and its subsidiaries associated with the Plan Income or

---

[14] *E.g.*, Cady Aff. Ex. 2, at KC-000158.
[15] Cady Aff. Ex. 1, § 7.4(b).
[16] *Id.* § 7.4(c)(i).
[17] Compl. ¶ 47.

4

Expense) had been distributed to the members of LDH (including the Company) upon liquidation of LDH in accordance with the LDH Agreement (assuming for this purpose that all Units are Vested Units), and (z) the amount of such distribution to the Company had been distributed to the Members in accordance with Section 8.3.[18]

The LLC agreement also stated that

[t]he Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values as determined by the Managing Member, immediately prior to the following times: . . . (ii) the distribution by the Company to a Member of more than a de minimis amount of Company assets as consideration for all or part of an interest in the Company (including the redemption of all or any portion of a Member's Units).[19]

Finally, the LLC agreement provided that

[a]ll determinations of Gross Asset Value made by the Managing Member shall be subject to the review and approval of the [Management Holdings] Board. Determinations of Gross Asset Value hereunder shall be made promptly following the relevant date and, to the extent applicable, shall be based on the Company's financial statements for the fiscal quarter ending on such relevant date or during which such relevant date occurs, unless otherwise determined by the Board.[20]

### 2. LDH Explores a Sale of the Midstream Assets

As of the fall of 2010, LDH contained two separate divisions: the Midstream

Assets Business, which consisted of natural gas pipelines and storage facilities, and

---

[18] Cady Aff. Ex. 1, at 7.

[19] *Id.* at 8.

[20] *Id.* The LLC agreement also provided that "[a]ny claim by a Participating Member, or any beneficiary of a Participating Member or any other person having or claiming a right under this Agreement or a Unit Award Agreement, may be asserted solely against [Management Holdings] or the Managing Member, as applicable." *Id.* § 9.9(a).

5

the Merchant Trading Business, which traded energy commodities through LDH's trading platform.[21] In November 2010, LDH retained Goldman Sachs and Barclays Capital to explore a sale of the Midstream Assets.[22] The next month, on December 14, LDH sent a ninety-six page confidential information memorandum to potential bidders for the Midstream Assets.[23] That memorandum contained extensive information about the Midstream Assets.[24] The bidders used the memorandum to formulate their bids, which were submitted on January 14, 2011.[25]

Even before the confidential information memorandum went out, however, Energy Transfer Partners ("ETP") had expressed interest in buying the Midstream Assets. On November 30, 2010, Goldman Sachs reached out to several parties, including ETP.[26] Kelcy Warren, ETP's CEO, responded to the inquiry by asking whether LDH would "entertain a pre-empt."[27] Warren noted that ETP was "considering many projects that would make this a very good fit," and he indicated that ETP "plan[ned] to be aggressive in this process."[28] The next day, Michael Dowling, the head of the Midstream Assets Business, sent an email to LDH Managing Director David Wallace, explaining that "Energy transfer would be a

---

[21] Compl. ¶ 39.
[22] Cady Aff. Exs. 5, 6.
[23] Cady Aff. Ex. 14.
[24] *Id.*
[25] Cady Aff. Ex. 20; Cady Aff. Ex. 45, at 185:25–187:5
[26] Cady Aff. Ex. 7.
[27] *Id.* at CCIDEL_00001901.
[28] *Id.*

perfect fit for our merchant. They have no liquids marketing and would likely be interested in us partnering on projects."[29]

About a week later, on December 10, Dowling followed up with Wallace and Ferris: "This is the guy [ETP's CEO] that asked if they can stop the process and go exclusive. . . . As I stated before, it could be they think this [that is, agreeing to a joint venture with LDH involving a fractionator] is a way to do an exclusive with us as our assets and people are an excellent fit with them."[30] ETP reached out to LDH again a few days later.[31] Dowling informed Ferris and Wallace that ETP "would like to go exclusive and [the CEO] asked about the possibility."[32] Dowling also noted that he had told ETP to "continue communications with Goldman on the topic."[33]

Capone and Scheinman testified at their depositions that, in mid-December 2010, they learned that ETP was interested in buying the Midstream Assets for around $2 billion. Capone said that two or three Houston-based LDH employees had told him about a "rumor . . . that ETP [wa]s gonna pay close to $2 billion for . . . this bunch of assets."[34] After returning to LDH's headquarters in Connecticut, Capone shared the rumor with several members of LDH management, including

---

[29] *Id.* at CCIDEL_00001898.
[30] Cady Aff. Ex. 11.
[31] Cady Aff. Ex. 13.
[32] *Id.*
[33] *Id.*
[34] Cady Aff. Ex. 42, at 139:5–141:7.

Ferris.[35]  Around the same time, Scheinman learned from Ferris that "ETP asked to go exclusive and had proposed a number [that is, $2 billion]."[36]

### 3. LDH Performs Its Own Valuation of the Midstream Assets

On December 23, 2010, LDH finalized its own valuation of the Midstream Assets Business and the Merchant Trading Business.[37]  The valuation was performed as part of an issuance of a new series of Management Holdings Units; it was also used by LDH's auditors.[38] Ferris, Wallace, and Herbert Quan (an LDH Vice President) were responsible for creating the valuation,[39] and the LDH Board approved it.[40]  LDH valued the Midstream Assets using four methodologies: a comparable companies analysis, a transaction multiples analysis, a discounted cash flow ("DCF") analysis, and a master limited partner yield analysis.[41]  Based on these methodologies, LDH estimated that the Midstream Assets had an enterprise value of $1.43 billion as of December 31, 2010.[42]  The valuation report also noted that Goldman Sachs and Barclays Capital had estimated the Midstream Assets' enterprise value to be between $1.3 billion and $1.6 billion.[43]

---

[35] *Id.* at 148:7–10.
[36] Cady Aff. Ex. 48, at 64:6–7, 64:13–14.
[37] Cady Aff. Ex. 17.
[38] Toscano Aff. Ex. 6, at 58:2–7.
[39] Cady Aff. Ex. 45, at 168:16–21; Cady Aff. Ex. 46, at 14:8–14.
[40] Cady Aff. Ex. 41, at 43:14–17, 44:21–45:4; Cady Aff. Ex. 45, at 212:15–213:15; Cady Aff. Ex. 49, at 23:23–25:2.
[41] Cady Aff. Ex. 17, at 3–7.
[42] *Id.* at 1, 3; Cady Aff. Ex. 45, at 192:9–21.
[43] Cady Aff. Ex. 17, at 20.

The Plaintiffs take issue with several aspects of the December 23 valuation. Their primary criticism is that the DCF analysis used higher discount rates (and lower EBITDA multiples) than previous valuations. For example, in its November 30, 2010 DCF analysis, LDH used a discount rate of 8% to 10% and an EBITDA multiple of 9.5 to 10.5 to value Mont Belvieu, the largest piece of the Midstream Assets.[44] As a result, the Midstream Assets were valued at between $1.65 billion and $1.96 billion.[45] By contrast, in the December 23 DCF analysis, LDH valued Mont Belvieu using a discount rate of 10% to 12% and an EBITDA multiple of 7.5 to 8.5.[46] The result was that the Midstream Assets were valued in the range of $1.33 to $1.61 billion.[47] The Plaintiffs also point out that Dowling, who headed the Midstream Assets Business, could not recall playing any role in generating the December 23 valuation.[48] And they complain that Ferris, who helped prepare the valuation, could not recall whether it was required to be conducted in good faith.[49]

### 4. The Plaintiffs Are Fired, and the Sales Process Continues

As noted above, Capone was fired in January 2011, and Scheinman was terminated in December 2010 (though the termination did not become effective until

---

[44] Cady Aff. Ex. 15, at 21.
[45] *Id.*
[46] Cady Aff. Ex. 17, at 6.
[47] *Id.*
[48] Cady Aff. Ex. 43, at 102:22–103:19.
[49] Cady Aff. Ex. 45, at 221:22–222:2. The Plaintiffs also point out that Highbridge Capital, one of LDH's owners, offered a slightly higher valuation of the Midstream Assets. Cady Aff. Ex. 18.

9

January 2011).[50] Around the same time, LDH was continuing its efforts to auction the Midstream Assets. On January 14, LDH received twenty-three conforming bids for the Assets.[51] The median bid was $1.8 billion, and all but one of the twenty-three bids were higher than the $1.43 billion valuation LDH had placed on the Midstream Assets on December 23.[52] Goldman Sachs described the bids as "preliminary indicative bids," and they were not binding.[53]

About a week after the bids came in, Scheinman told Reed, LDH's CEO, that it was legal error not to take account of the bids in valuing the Midstream Assets.[54] Scheinman also told Wallace that it was a mistake not to consider "third-party bids," and that "the company was obligated to be sure about this because the so-called profits interest characterization of the units based on the IRS guidance required that the Series 1 be fully valued before issuing Series 2."[55] Later, on January 25, Scheinman sent an email to Reed and Wallace: "In the spirit of our 'spirited debate' yesterday, here are the Tax regulations governing the determination of FMV for book-up purposes."[56] Wallace then emailed Reed to "suggest refraining from

---

[50] Compl. ¶¶ 14–15.
[51] Cady Aff. Ex. 20, at 4.
[52] *Id.*
[53] Toscano Aff. Ex. 15.
[54] Cady Aff. Ex. 45, at 232:3–15; Cady Aff. Ex. 48, at 170:16–171:19.
[55] Cady Aff. Ex. 48, at 209:20–210:2; *see also* Cady Aff. Ex. 50, at 42:25–43:19.
[56] Cady Aff. Ex. 23.

continuing this dialogue."[57]  Scheinman made the same argument about considering third-party bids to John Damasco, LDH's Tax Director.[58]

On January 28, Damasco sent an email to Wallace and Ferris, informing them that he had "[s]poke[n] to Steve [Scheinman] last night at his farewell party and he told me he wants to discuss the valuation issue with Bill [Reed] today.  Steve also indicated that Capone has the same valuation question."[59]  Damasco labeled the email "PRIVILEGED & CONFIDENTIAL ATTORNEY WORK PRODUCT."[60]

The next month, on February 4, Capone wrote a letter to Reed in which he expressed concern that "the Fair Market Value at 12/31/10 has been set exceedingly low, especially in light of the bids for the assets that came in just a few days later."[61]  Indeed, Capone said that "[i]f . . . the FMV has been significantly undervalued, it would be devastating to the value of my interest in the equity plan and it is something I would need to review and perhaps formally question."[62]  Reed did not respond to the letter.[63]

---

[57] *Id.*
[58] Cady Aff. Ex. 48, at 213:19–214:15.
[59] Cady Aff. Ex. 24.
[60] *Id.* (emphasis omitted).  Damasco included the same label in another email in this chain.  *Id.*
[61] Cady Aff. Ex. 25, at KC-000227.
[62] *Id.*
[63] Cady Aff. Ex. 42, at 183:17–184:17.

### 5. The Midstream Assets Are Sold, and the Plaintiffs' Units Are Redeemed

On March 22, 2011, LDH sold the Midstream Assets to a joint venture between ETP and Regency Energy Partners for $1.925 billion.[64] Then, on April 12, 2011, the Defendants redeemed the Plaintiffs' Units.[65] For purposes of the redemptions, the Defendants valued LDH as a whole at $1.744 billion, and the Midstream Assets in particular at $1.43 billion.[66] The valuations purported to be based on the fair market value of LDH as of December 31, 2010.[67] As the Plaintiffs point out, however, $1.744 billion is about $200 million less than the $1.925 billion ETP paid to acquire the Midstream Assets alone, and there is no evidence that the Assets materially increased in value between December 2010 and March 2011.

On April 20, 2011, Scheinman sent Ferris an email asking for information about how "the per Unit price of $780,919.29 was derived from the $1,744 million."[68] Ferris forwarded the email to Damasco, who then said that his "litigation view would be to discuss verbally as opposed to written communication."[69] For his part, Capone continued to reach out to Reed, sending a letter on May 17 in which he expressed confusion about "how the low value of $1.744 billion could have been

---

[64] Cady Aff. Ex. 27.
[65] Cady Aff. Ex. 29, at CCIDEL_00004956–57; Toscano Aff. Exs. 16, 17.
[66] Toscano Aff. Exs. 16, 17; Cady Aff. Ex. 45, at 193:14–19, 204:10–12.
[67] Toscano Aff. Exs. 16, 17.
[68] Cady Aff. Ex. 32, at 2.
[69] *Id.* at 1.

reached given the fact that only one part of the Company was sold a few months later for more than $1.9 billion."[70]  While Reed did not respond to this letter,[71] he and Ferris met with several LDH employees (including an LDH lawyer) to discuss it.[72]  Three days after this meeting, Capone sent a follow-up email to Reed, who again did not write back.[73]  Capone then emailed Ferris, who responded by saying that he was "a little puzzled why you feel the need to write letters and send detailed emails to Bill [Reed]."[74]  Ferris nevertheless agreed to discuss Capone's questions over the phone.[75]

Capone and Ferris spoke over the phone on June 7, 2011.[76]  Ferris answered some of Capone's questions about the valuation, but the conversation quickly became "almost a shouting match where [Ferris] told me to get off . . . my soapbox, and to stop lecturing him or he was going to end the call right now and not give me anymore [sic] information."[77]  Capone testified that during the call he accused the Defendants of "act[ing] in bad faith under the contract . . . [and] act[ing] with malice."[78]  Indeed, Capone "told [Ferris] I thought he had breached, very clearly."[79]

---

[70] Cady Aff. Ex. 34.
[71] Cady Aff. Ex. 42, at 184:12–14.
[72] Cady Aff. Ex. 35.
[73] Cady Aff. Ex. 36; Cady Aff. Ex. 42, at 184:12–14.
[74] Cady Aff. Ex. 38.
[75] *Id.*
[76] Cady Aff. Ex. 39; Cady Aff. Ex. 42, at 181:5–182:5.
[77] Cady Aff. Ex. 42, at 181:11–18.
[78] *Id.* at 181:19–21; *see also* Cady Aff. Ex. 39, at KC-000303.
[79] Cady Aff. Ex. 42, at 188:6–7.

Capone further testified that he called Ferris "a liar and [said] he was cheating."[80]

Ferris had a similar recollection of the conversation:

> I remember reviewing the valuation methodology with him and, at the end, having him accuse me of lying and cheating. And I use the word "cheating" not as a specific reference of words that he said, but more the accusation that the valuation was fixed at a level that he disagreed with and that was done out of malice.[81]

Ferris later told Reed about his conversation with Capone.[82]

### 6. The LLCs Are Cancelled, and the Plaintiffs Pursue Litigation in New York

On December 31, 2012, LDH was acquired by third-party investors and renamed Castleton Commodities International LLC.[83] That same day, Management Holdings and Managing Member were cancelled.[84] John Damasco, LDH's Tax Director, testified that the cancellations were part of the restructuring necessary to consummate the acquisition.[85] The Defendants did not notify the Plaintiffs of the cancellations, and the Defendants did not reserve funds for Plaintiffs' claims relating to breach of the LLC agreement.[86]

---

[80] *Id.* at 181:21–22.
[81] Cady Aff. Ex. 45, at 242:25–243:9.
[82] *Id.* at 244:2–3.
[83] *Capone v. Castleton Commodities Int'l, LLC*, 2016 WL 1222163, at *3 (N.Y. Sup. Ct. Mar. 29, 2016), *aff'd*, 48 N.Y.S.3d 583 (App. Div. 2017).
[84] Toscano Aff. Ex. 24.
[85] Toscano Aff. Ex. 25, at 210:7–14.
[86] Compl. ¶¶ 90, 94.

On May 21, 2015, the Plaintiffs sued Management Holdings, Managing Member, and Castleton in New York state court for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.[87] The Plaintiffs later amended their complaint, adding Builione, Dubin, Ferris, Reed, and Veyrat as defendants, and seeking recovery "for contractual breaches, unjust enrichment, torts, wrongful cancellation of Management Holdings and the Managing Member, and clawback of the improper distributions and/or transfers of Management Holdings' and the Managing Member's assets."[88] The Plaintiffs' breach of contract claims rested on the allegation that the "Defendants failed to determine in good faith the fair market value of LDH Energy and Plaintiffs' Units."[89] On March 29, 2016, the New York court dismissed all of the Plaintiffs' claims except the breach of contract claims against the LLCs, which the court stayed pending a ruling from this Court on the Plaintiffs' claim for nullification of the cancellations.[90]

*C. This Litigation*

The Plaintiffs commenced this action on November 6, 2015, and they amended their Complaint on July 5, 2016. Count I of the Complaint seeks an order nullifying the cancellations of Management Holdings and Managing Member.[91]

---

[87] *Id.* ¶ 96.
[88] *Id.* ¶ 98.
[89] Toscano Aff. Ex. 26, ¶ 101.
[90] *Capone*, 2016 WL 1222163, at *10.
[91] Compl. ¶¶ 101–04.

15

According to the Plaintiffs, the Defendants violated Delaware law by cancelling the LLCs without setting aside a reserve for the Plaintiffs' breach of contract claims.[92] Count II seeks to hold the Defendants liable for that purported violation of Delaware law.[93] In Count III, the Plaintiffs seek to hold the Defendants "liable for clawbacks up to the amount of any distributions they received [as part of the acquisition and cancellations] in order to satisfy Plaintiffs' claims against Management Holdings and the Managing Member."[94] Finally, Count IV alleges that the Defendants fraudulently transferred assets belonging to Management Holdings and Managing Member in the course of winding up those entities.[95]

On December 2, 2016, I denied the Defendants' Motion to Dismiss as to Count I and asked the parties to confer about how the litigation should go forward.[96] The parties then agreed that the Motion to Dismiss as to Counts II to IV would be withdrawn without prejudice, and that discovery would proceed as to Count I. After the completion of that discovery, the parties cross-moved for summary judgment on the Plaintiffs' nullification claim.[97] I heard oral argument on those Motions on

---

[92] *Id.* ¶ 103.
[93] *Id.* ¶¶ 105–09.
[94] *Id.* ¶ 120.
[95] *Id.* ¶¶ 123–34.
[96] Dec. 2, 2016 Oral Arg. Tr. 69:18–74:12.
[97] According to the Defendants, a ruling in their favor on Count I necessarily means they win on the remaining Counts. Because the Plaintiffs are entitled to summary judgment on Count I, I need not address this issue.

16

February 13, 2018, during which the parties agreed that I could consider the Motions submitted on a stipulated record.[98]

## II. ANALYSIS

Under Court of Chancery Rule 56, summary judgment shall be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[99] The moving party bears the initial burden of demonstrating the "absence of a material factual dispute."[100] If the moving party makes this initial showing, "the burden shifts to the nonmovant to present some specific, admissible evidence that there is a genuine issue of fact for a trial."[101] In reviewing a summary judgment motion, the Court "must view the evidence in the light most favorable to the non-moving party."[102] Thus, the Court must deny a request for summary judgment "if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom."[103]

Where, as here, the parties have filed cross-motions for summary judgment and have not argued that a material issue of fact exists, "the Court shall deem the

---

[98] Feb. 13, 2018 Oral Arg. Tr. 4:20–5:3.

[99] Ct. Ch. R. 56(c).

[100] *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 356 (Del. Ch. 2008) (quoting *Levy v. HLI Operating Co.*, 924 A.2d 210, 219 (Del. Ch. 2007)).

[101] *Id.*

[102] *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99 (Del. 1992).

[103] *In re El Paso Pipeline Partners, L.P. Derivative Litig.*, 2014 WL 2768782, at *8 (Del. Ch. June 12, 2014) (quoting *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970)).

motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[104]  Nevertheless, "even when presented with cross-motions for summary judgment, a court must deny summary judgment if a material factual dispute exists."[105]

### A. Nullification

The parties have moved for summary judgment on the Plaintiffs' nullification claim.  That claim seeks to revive the cancelled LLCs—Management Holdings and Managing Member—so that the Plaintiffs can pursue their breach of contract claims against those entities in New York.[106]  Specifically, the Plaintiffs argue that the Defendants violated Section 18-804(b) of the Delaware Limited Liability Company Act by cancelling the LLCs without setting aside a reserve to cover the Plaintiffs' breach of contract claims.  According to the Plaintiffs, at the time of cancellation, the Defendants either knew of the claims or were aware of facts that made them likely to arise.  Either way, say the Plaintiffs, the Defendants improperly wound up the LLCs, making it appropriate to nullify the certificates of cancellation.  The Defendants argue strenuously that the dissolutions were in compliance with the Act;

---

[104] Ct. Ch. R. 56(h).

[105] *Bank of N.Y. Mellon v. Realogy Corp.*, 979 A.2d 1113, 1119 (Del. Ch. 2008).

[106] As this Court has pointed out, Section 18-803(b) of the LLC Act "provides that suit generally may be brought by or against a limited liability company only until the certificate of cancellation is filed."  *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 138 (Del. Ch. 2004).

18

they do not contest that, should I find that their actions violated the Act, nullification of the cancellations is the appropriate remedy.

I turn first to the relevant provisions of the LLC Act. I then examine whether the Plaintiffs have established that the LLCs were cancelled in violation of the Act.

1. Section 18-804(b)

Section 18-804 of the LLC Act governs the distribution of a dissolved LLC's assets. In particular, Section 18-804(b)(1) provides that "[a] limited liability company which has dissolved" "[s]hall pay or make reasonable provision to pay all claims and obligations, including all contingent, conditional or unmatured contractual claims, known to the limited liability company."[107] Section 18-804(b)(3) requires an LLC undergoing the wind-up process to

> make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the limited liability company or that have not arisen but that, based on facts known to the limited liability company, are likely to arise or to become known to the limited liability company within 10 years after the date of dissolution.[108]

---

[107] 6 *Del. C.* § 18-804(b)(1).

[108] *Id.* § 18-804(b)(3). Section 18-804(b)(2) provides that a dissolved LLC "[s]hall make such provision as will be reasonably likely to be sufficient to provide compensation for any claim against the limited liability company which is the subject of a pending action, suit or proceeding to which the limited liability company is a party." That provision is irrelevant here, because the Plaintiffs' breach of contract claims were not the subject of a pending suit or proceeding when the LLCs were dissolved.

If an LLC is not wound up in accordance with the LLC Act, this Court "may nullify the certificate of cancellation, which effectively revives the LLC and allows claims to be brought by and against it."[109]

Several features of these statutory provisions bear emphasis. First, Section 18-804(b)(1) is clear that a dissolved LLC must provide for *all* claims—"including all *contingent*, *conditional* or *unmatured* contractual claims"—that are "known to the limited liability company."[110] One leading treatise provides an illustrative discussion of the LLC Act's treatment of known claims:

> One example of a contingent, conditional contractual claim is a right to indemnification under the limited liability company agreement; under many such indemnification provisions, the claim arises only if a covered loss occurs and becomes an entitlement only if the would-be indemnitee has satisfied an applicable standard of conduct. A contingent or conditional claim against the limited liability company must be accounted for under Section 18-804([b])(1) *irrespective of the likelihood that it will actually "vest."*[111]

Second, "claims" are not limited to purely contractual obligations; instead, they "include, without limitation, contract, tort, or statutory (e.g., tax) claims against . . . the limited liability company, whether or not . . . reduced to judgment."[112]

---

[109] *Matthew v. Laudamiel*, 2012 WL 605589, at *22 n.148 (Del. Ch. Feb. 21, 2012).

[110] 6 *Del. C.* § 18-804(b)(1) (emphasis added).

[111] Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 16.06[E][2][b][ii] (2d ed. 2016) (emphasis added). Nevertheless, as discussed below, "[t]he probability of such vesting may be relevant . . . in determining whether provision for payment . . . is reasonable." *Id.*

[112] *Id.*

Finally, the LLC Act provides some flexibility to those tasked with making provision for a dissolved LLC's claims and obligations.[113] The Act "does not specify a particular method by which the dissolved company must provide for claims and obligations that it does not pay on a current basis."[114] Instead, "[t]he statute simply sets forth a reasonableness standard by which any provision for payment is to be evaluated."[115] Whether a provision for a particular claim is reasonable depends on several factors, including "the potential amount of such [a] claim[] and the likelihood of [it] actually becoming [a] liabilit[y] for which the company must answer."[116] "For example, with respect to evaluation of claims, the minimal likelihood of a given claim . . . actually arising or vesting could justify the reasonableness of making no provision, or minimal provision, for payment thereof."[117] Likewise, a claim "might be valued by applying a discount based on probability of success."[118] Statutory flexibility notwithstanding, I must keep in mind Section 18-804's underlying

---

[113] *Id.* § 16.06[E][2][c][ii].
[114] *Id.*
[115] *Id.* § 16.06[E][2][c][iii]; *see also* 6 *Del. C.* § 18-804(b)(1) (requiring a dissolved LLC to make "*reasonable* provision to pay" claims and obligations) (emphasis added); *id.* § 18-804(b)(2) (requiring a dissolved LLC to make "such provision as will be *reasonably* likely to be sufficient to provide compensation for" claims) (emphasis added).
[116] Symonds & O'Toole, *supra*, § 16.06[E][2][c][iii].
[117] *Id.*
[118] *Id.*

21

purpose of providing "mandatory protection to creditors of a limited [limited company] if the [limited liability company] dissolves and winds up its affairs."[119]

### 2. The Plaintiffs' Breach of Contract Claims

The first step in analyzing the Plaintiffs' request for nullification is to understand the claims for which the Defendants purportedly were required to make provision. According to the Plaintiffs, the Defendants breached the LLC agreement by redeeming the Plaintiffs' Units based on a bad-faith estimate of LDH's value as of December 31, 2010. The LLC agreement gave Management Holdings the right to redeem the Plaintiffs' Units if the Plaintiffs were terminated without cause. The redemption had to be based on the "Fair Market Value" of those Units as of December 31, 2010.[120] Under the LLC agreement, "Fair Market Value" meant,

> with respect to a Unit of a particular Series, the amount that would be distributed as of any relevant date [here, December 31, 2010] if (x) all of the assets of LDH and its subsidiaries had been sold at their Gross Asset Value (adjusted immediately prior to such deemed sale by the [Management Holdings] Board *in good faith* and in consultation with the LDH Board).[121]

The LLC agreement further provided that

---

[119] *Techmer Accel Holdings, LLC v. Amer*, 2010 WL 5564043, at *7 (Del. Ch. Dec. 29, 2010). *Amer* involved a limited partnership, not an LLC. Given the dearth of caselaw interpreting the relevant provisions of the LLC Act, I may look to cases examining analogous statutory provisions for guidance. *See, e.g.*, *In re Delta Holdings, Inc.*, 2004 WL 1752857, at *8 & n.54 (Del. Ch. July 26, 2004) (evaluating a corporation's wind-up process by reference to a case involving a limited partnership because "[t]he same considerations guiding the Court in that decision-the protection of creditors in the end-game of an entity's existence-guide the Court here").
[120] Cady Aff. Ex. 1, § 7.4(c)(i).
[121] *Id.* at 7 (emphasis added).

Gross Asset Value . . . shall be [determined] promptly following the relevant date [here, December 31, 2010] and, to the extent applicable, shall be based on the Company's financial statements for the fiscal quarter ending on such relevant date or during which such relevant date occurs, unless otherwise determined by the Board.[122]

The Defendants redeemed the Plaintiffs' Units in April 2011. For purposes of the redemptions, the Defendants valued LDH as of December 31 using only the information contained in the December 23 valuation. Thus, the Defendants valued LDH as a whole at $1.744 billion, and they valued the Midstream Assets in particular at $1.43 billion. The problem, according to the Plaintiffs, is that between December 23, 2010, and April 2011, highly probative evidence emerged that, as of December 31, the Midstream Assets were worth almost half a billion dollars more than the value used to redeem the Units. Specifically, on January 14, 2011, LDH received twenty-three bids for the Midstream Assets, and the median bid was $1.8 billion. Indeed, twenty two of those bids were higher than $1.43 billion. And in March 2011, LDH sold the assets to a joint venture for $1.925 billion. Notably, the record is devoid of evidence that the Midstream Assets materially increased in value between December 2010 and March 2011.

The Plaintiffs argue that the Defendants breached the LLC agreement by refusing to take account of this market evidence in redeeming the Units. The Plaintiffs focus on the LLC agreement's requirement that Management Holdings

---

[122] *Id.* at 8.

23

"adjust[] [the Gross Asset Value of LDH's assets] immediately prior to [the] deemed sale . . . *in good faith*."[123]  By the Plaintiffs' lights, a good-faith valuation of LDH could not ignore market evidence suggesting that the Midstream Assets were worth far more than the December 23 valuation implied.[124]  The Plaintiffs also draw attention to the LLC agreement's requirement that the determination of gross asset value be made "promptly following the relevant date [here, December 31]."[125]  The Defendants purportedly violated that provision by determining gross asset value on December 23, over a week *before* the relevant date.  According to the Plaintiffs, the Defendants knew that bids probative of fair market value would arrive in January, so they performed the valuation ahead of the schedule established by the LLC agreement.

### 3. Were the Defendants on Notice of the Plaintiffs' Claims?

I now turn to the question whether the Defendants were aware of the Plaintiffs' breach of contract claims in December 2012, when the LLCs were dissolved.  Section 18-804(b)(1) requires that provision be made for claims "known to the limited liability company."[126]  The LLC Act defines "knowledge" "as a person's actual knowledge of a fact, rather than the person's constructive knowledge

---

[123] *Id.* at 7 (emphasis added).
[124] The Plaintiffs additionally argue that it was improper for LDH to ignore the December 2010 rumor that ETP was interested in buying the Midstream Assets for around $2 billion.
[125] *Id.* at 8.
[126] 6 *Del. C.* § 18-804(b)(1).

of the fact."[127]  Thus, "known claims and obligations [are] limited to those of which the limited liability company has actual, rather than constructive, knowledge."[128]  In my view, the record is clear that the Defendants, including LDH's CEO, were aware of the Plaintiffs' claims for breach of contract when the LLCs were cancelled.[129]

### a. Capone

Even before his Units were redeemed in April 2011, Capone was objecting to LDH's valuation of its assets.  On February 4, he wrote Reed, LDH's CEO, to stress the importance of ensuring "a fair result" with respect to "the equity plan."[130]  Capone was "worried that the Fair Market Value at 12/31/10 has been set exceedingly low, especially in light of the bids for the [Midstream Assets] that came in just a few days later."[131]  Capone further suggested that if LDH had in fact been "significantly undervalued, it would be devastating to the value of my interest in the equity plan and it is something I would need to review and perhaps formally question."[132]

---

[127] *Id.* § 18-101(5).

[128] Symonds & O'Toole, *supra*, § 16.06[E][2][b][ii].

[129] Because I find that the Defendants were aware of the Plaintiffs' claims under Section 18-804(b)(1), I need not decide whether the Plaintiffs have also established an improper cancellation under Section 18-804(b)(3), which covers "claims that have not been made known to the limited liability company or that have not arisen but that, based on facts known to the limited liability company, are likely to arise or to become known to the limited liability company."  6 *Del. C.* § 18-804(b)(3).

[130] Cady Aff. Ex. 25, at KC-000227.

[131] *Id.*

[132] *Id.*

Capone continued to complain about the valuation after his Units were redeemed. On May 17, he wrote another letter to Reed, seeking information that would clarify "the basis for the amounts I have been paid and that I am to be paid next year in connection with the Company's Call of my Units."[133] Capone confessed to "having difficulty understanding how the low value of $1.744 billion could have been reached given the fact that only one part of the Company was sold a few months later for more than $1.9 billion."[134] Reed did not write back; indeed, he never responded to any of Capone's inquiries. Reed did take notice, though: Soon after receiving the May 17 letter, Reed met with Ferris and an LDH lawyer to discuss it.

Capone eventually got Ferris to agree to talk on the phone about some of Capone's concerns regarding the valuation. The two spoke on June 7, 2011. During the conversation, Capone accused the Defendants of "act[ing] in bad faith under the contract . . . [and] act[ing] with malice."[135] Capone also "told [Ferris] I thought he had breached, very clearly."[136] Finally, Capone called Ferris a liar and a cheater. Ferris's recollection of the conversation tracked Capone's, and Ferris told Reed about the call.

---

[133] Cady Aff. Ex. 34.
[134] *Id.*
[135] Cady Aff. Ex. 42, at 181:19–21; *see also* Cady Aff. Ex. 39, at KC-000303.
[136] Cady Aff. Ex. 42, at 188:6–7.

The evidence just reviewed makes clear that, as of June 2011, at least two of LDH's highest-ranking officers knew that Capone had not only raised serious questions about the valuation used to redeem his Units, but had specifically accused the Defendants of breaching the LLC agreement in connection with that valuation. Capone's repeated complaints about the valuation both before and after the redemption track the allegations underlying the Plaintiffs' breach of contract claims—namely, that the "Defendants failed to determine in good faith the fair market value of LDH Energy and Plaintiffs' Units."[137] Moreover, Capone's breach of contract claim raised the prospect of millions of dollars in damages. For example, the Plaintiffs' New York complaint seeks "$7.5 million to Capone . . . , in respect of the money taken from Capone based on the understated value of the Midstream Asset Business."[138] Of course, a request for damages is just that—a request. But about a month before the redemptions, LDH itself calculated the losses that Capone, Scheinman, and another departing LDH executive would incur as a result of the valuation: "The post 12/31/2010 [Unit] value (assuming asset sale @ 1.9B) to Former Employees would have been an additional $5m of incremental value."[139] The large sums potentially at stake in Capone's breach of contract claim make it

---

[137] Toscano Aff. Ex. 26, ¶ 101.
[138] *Id.* at 33.
[139] Cady Aff. Ex. 25B, at CCIDEL_00011136. Ferris testified at his deposition that he was "sure" LDH had performed such a calculation. Cady Aff. Ex. 45, at 320:23–321:7.

more likely that the Defendants were paying close attention when he raised concerns about the valuation in early to mid-2011. Thus, the Plaintiffs have established that the Defendants were aware of Capone's claim for breach of contract when the LLCs were cancelled in December 2012.[140]

### b. Scheinman

Scheinman was not as persistent or vocal as Capone in objecting to the valuation. Nevertheless, Scheinman took enough steps to put the Defendants on notice of his claim as well. Soon after LDH received almost two dozen bids for the Midstream Assets, Scheinman told Reed and Wallace, LDH's Managing Director, that it was legally improper not to consider the bids in valuing the Assets. Scheinman expressed the same view to Damasco, LDH's Tax Director. In an email labeled "PRIVILEGED & CONFIDENTIAL ATTORNEY WORK PRODUCT," Damasco told Wallace and Ferris that he had "[s]poke[n] to Steve [Scheinman] last night at his farewell party and he told me he wants to discuss the valuation issue with Bill [Reed] today. Steve also indicated that Capone has the same valuation

---

[140] I reject the Defendants' suggestion that I should not impute knowledge of Capone's claim to the Defendants because Capone "stayed silent" from June 2011 to May 2015, when the New York lawsuit was initiated. Defs.' Reply Br. 21. By June 2011, Capone had made very clear his position that the Defendants had breached the LLC agreement. To my mind, it would make little sense to find that an LLC lacked "knowledge" of a claim unless the claimant continued to remind the company of the claim. That is especially so here, where the company in question was run by sophisticated actors who could reasonably be expected to make a record of potential litigation by former high-level executives—particularly when that potential litigation raised the prospect of millions of dollars in damages. Moreover, the Defendants do not suggest that the Plaintiffs brought their breach of contract claims after the expiration of the applicable statute of limitations.

28

question."[141]  Moreover, after his Units were redeemed in April 2011, Scheinman emailed Ferris seeking information about how "the per Unit price of $780,919.29 was derived from the $1,744 million."[142]  That email was forwarded to Damasco, who stated that his "litigation view would be to discuss verbally as opposed to written communication."[143]

Unlike Capone, Scheinman never explicitly accused the Defendants of breaching the LLC agreement.  But Scheinman told several high-level LDH executives that, in his opinion, it was legal error not to consider the January 14 bids in fixing a value for the Midstream Assets.  One of those executives appears to have thought litigation over the valuation was a real possibility,[144] since he labeled "ATTORNEY WORK PRODUCT" at least two emails he sent about the issue.[145] And soon after the redemptions took place, Scheinman emailed LDH's CFO asking for information about how his Units were valued.  True, Scheinman testified that he had only friendly interactions with Reed after his termination.[146]  But Scheinman

---

[141] Cady Aff. Ex. 24.  As noted above, Damasco labeled another email in this chain in the same manner. *Id.*

[142] Cady Aff. Ex. 32, at 2.

[143] *Id.* at 1.

[144] Notably, there was no mystery as to who the defendants would be in such a litigation.  The LLC agreement provided that the any claims by the Plaintiffs relating to the Units "may be asserted solely against [Management Holdings] or the Managing Member, as applicable."  Cady Aff. Ex. 1, § 9.9(a).

[145] *See, e.g.*, *Rohm & Haas Co. v. Dow Chem. Co.*, 2009 WL 537195, at *2 (Del. Ch. Feb. 26, 2009) ("The key question that the Court must ask when evaluating a claim of work product protection is whether the material at issue was 'prepared in anticipation of litigation or for trial.'" (quoting Ct. Ch. R. 26(b)(3))).

[146] Cady Aff. Ex. 48, at 115:9–116:14; 176:24–177:6; 177:22–179:4.

29

also testified that he never told Reed that their disagreements over the valuation used to redeem his units had been resolved.[147] To my mind, all of this evidence demonstrates that the Defendants were on notice of Scheinman's claim for breach of the LLC agreement.[148] Additionally, the Defendants surely evaluated Scheinman's concerns in light of Capone's contemporaneous and strongly stated position that the Defendants had acted in bad faith.[149]

> 4. Did the Defendants Make Reasonable Provision for the Plaintiffs' Claims?

Having found that the Defendants were on notice of the Plaintiffs' claims, I next determine whether the Defendants made reasonable provision for those claims. As noted above, Section 18-804(b)(1) requires a dissolved LLC to "pay or make reasonable provision to pay all [known] claims."[150] It is undisputed that the Defendants did not set aside any funds for the Plaintiffs' claims. According to the Defendants, that was entirely proper, because those claims were "meritless," and a

---

[147] *Id.* at 206:17–21. The Defendants also point to Scheinman's admission in this litigation that he considered litigation to be a mere "possibility" in late 2012. *Id.* at 22:17–21. But Scheinman's intentions are, strictly speaking, beside the point; the question under Section 18-804(b)(1) is whether the *LLCs* were aware of a potential claim. The Defendants do not point to any evidence suggesting that Scheinman told anybody at LDH that litigation was merely possible, or unlikely, let alone that he was waiving any claim.

[148] In any event, even if Scheinman's complaints alone were not enough to put the Defendants on notice, Capone's certainly were. And I agree with the Plaintiffs that Capone and Scheinman's breach of contract claims were sufficiently similar that notice as to one of them provided notice as to the other.

[149] *See* Cady Aff. Ex. 24 ("Steve also indicated that Capone has the same valuation question.").

[150] 6 *Del. C.* § 18-804(b)(1).

30

reserve of zero dollars was therefore sufficient to account for them.[151] I agree with the Defendants' premise, but not their conclusion.

Several considerations inform the reasonableness inquiry, including "the potential amount of . . . [a] claim[] and the likelihood of [it] actually becoming [a] liabilit[y] for which the company must answer."[152] For instance, "the minimal likelihood of a given claim . . . actually arising or vesting could justify the reasonableness of making no provision, or minimal provision, for payment thereof."[153] Similarly, a claim "might be valued by applying a discount based on probability of success."[154]

A hypothetical illustrates the point. Suppose a delusional individual who had never worked at LDH wrote a letter to Reed, LDH's CEO, just before the winding-up process began. In that letter, the individual maintained that the LLCs owed him $1 million for services rendered as an LDH employee, even though, as just noted, he had never worked at LDH. (Assume as well that Reed knew the individual was delusional and had never been employed by LDH.) Any claim stemming from such an allegation would be obviously frivolous so that a reserve of zero dollars would likely be sufficient to account for it. On the other hand, even a relatively weak claim

---

[151] Defs.' Opening Br. 18.
[152] Symonds & O'Toole, *supra*, § 16.06[E][2][c][iii].
[153] *Id.*
[154] *Id.*

31

may justify a reserve, especially where, as here, the claim raises the prospect of a large damages award.[155] Where the LLC faces a claim for a large amount, its principals are justified in nonetheless setting a reserve of zero dollars only where the claim is procedurally barred—as, for example, where a statute of limitation bars the claim—or where the claim itself is legally frivolous. Because the claims here were not procedurally barred, I examine their facial legal frivolity as known to the LLCs at the time of dissolution.[156]

Were the Plaintiffs' claims objectively frivolous at the time of dissolution? A claim is not frivolous simply because it will likely be unsuccessful.[157] Instead, the question is whether the claim "lacks even [a good-faith,] *arguable* basis in law."[158] In my view, the claims at hand easily clear this bar.

The Defendants argue that the Plaintiffs' claims lack merit because the LLC agreement forbade consideration of events postdating December 31, 2010, in valuing

---

[155] *See id.* (noting that a reasonable reserve may take account of "the potential amount of . . . [a] claim[]").

[156] At oral argument, counsel for the Defendants agreed that if the Defendants were aware of a "nonfrivolous claim" at the time of winding up, that would be enough to establish improper dissolution under Section 18-804(b). Feb. 23, 2018 Oral Arg. Tr. 12:15–13:14.

[157] *See, e.g.*, *Neitzke v. Williams*, 490 U.S. 319, 328 (1989) ("When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal on Rule 12(b)(6) grounds is appropriate, but dismissal on the basis of frivolousness is not."); *Allen v. Briggs*, 331 F. App'x 603, 604 (10th Cir. 2009) (noting that the *Neitzke* standard "means much more than just merely wrong"); *see also In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *1 n.1 (Del. Ch. Oct. 16, 2013) ("[T]he standard for expedition, colorability, which simply implies a non-frivolous set of issues, is even lower tha[n] the 'conceivability' standard applied on a motion to dismiss.").

[158] *Neitzke*, 490 U.S. at 328.

the Midstream Assets for purposes of the redemptions.[159]  The Defendants point to

the LLC agreement's definition of fair market value:

> "Fair Market Value" shall mean, with respect to a Unit of a particular
> Series, the amount that would be distributed as of any relevant date [that
> is, December 31, 2010] if (x) all of the assets of LDH and its
> subsidiaries had been sold at their Gross Asset Value (adjusted
> immediately prior to such deemed sale by the [Management Holdings]
> Board in good faith and in consultation with the LDH Board).[160]

The Defendants emphasize that the good-faith obligation relied on by the Plaintiffs

appears in a clause requiring that any adjustment to the valuation be performed

"immediately prior to such deemed sale."[161]  According to the Defendants, the

"deemed sale" in this provision unambiguously refers to "the hypothetical sale

whose proceeds were distributed as of December 31, 2010."[162]  Since an adjustment

made before December 31 cannot possibly take account of information from

subsequent months, the LLC agreement supposedly prohibited the Defendants from

considering the January 14 bids or the March 2011 sale in valuing the Midstream

Assets and, by extension, the Plaintiffs' Units.

    The Plaintiffs offer two primary responses to this argument.  First, they say

that the phrase "adjusted immediately prior to such deemed sale" simply means "that

---

[159] The Defendants also argue that the Plaintiffs have abandoned any claim premised on a failure to consider ETP's purported $2 billion offer in December 2010.  I need not address this issue, however, because I conclude that the Plaintiffs' claims are not frivolous to the extent they rely on a failure to consider events after December 31, 2010.

[160] Cady Aff. Ex. 1, at 7.

[161] *Id.*

[162] Defs.' Opening Br. 26.

immediately prior to redeeming Units, the Board will determine in good faith the fair market value used to redeem the Units."[163]   According to the Plaintiffs, that good-faith determination should have taken into account the highly probative market evidence that emerged between December 31 and the April 2011 redemptions. Second, according to the Plaintiffs, the Defendants ignore that the valuation was finalized on December 23, over a week before the "as of" date. The Plaintiffs view that decision as improper in light of the LLC agreement, which required the determination of gross asset value to be made "promptly following the relevant date [that is, December 31]."[164]   The Plaintiffs also suggest that this early valuation supports an inference of bad faith on the part of the Defendants, who knew probative market evidence would arrive when the bids came in less than a month later.  In the Plaintiffs' view, the actual sale price is not *itself* determinative of value as of the date of the hypothetical sale, but it is strong evidence of value as of that date. This is, in my view, not a frivolous position.

To repeat, my task is not to decide the merits of these competing interpretations of the LLC agreement.  The Plaintiffs' breach of contract claims are not before me; they are being pursued in the New York action (though, as noted above, the New York court has reserved decision pending my resolution of the

---

[163] Pls.' Opening Br. 58.
[164] Cady Aff. Ex. 1, at 8.

request for nullification).  It is for that court to determine what view of the contract, in light of the facts, must prevail.  My task is different, and focuses on the reasonableness of the LLCs' reserve at the time of dissolution.  That issue requires that I determine whether the Defendants acted reasonably by setting a zero-dollar reserve, based on their apparent determination that any claim raised by the Plaintiffs would be clearly meritless.  I find that they did not.

Nothing in the LLC agreement unequivocally states that information learned after December 31, and relevant to value as of the time immediately preceding the "deemed sale," cannot be considered in determining the fair market value of the Plaintiffs' Units.  While the Defendants may be correct that the phrase "adjusted immediately prior to such deemed sale" achieves the same prohibitory effect, their reading of that provision is not the only reasonable construction.  It is not indisputably wrong to read the provision, as the Plaintiffs do, as simply requiring a good-faith adjustment of the LDH assets' gross asset value immediately before redeeming a terminated employee's Units.[165]

---

[165] Consider a contractual provision requiring a good-faith valuation on July 1 of corporate assets as of December 31 of the previous year.  It is in the corporate interest that the valuation be as low as possible.  The assets, so far as is known on December 31, had a value of $1,000,001.  $1 of this valuation was attributed to a framed $1 bill, the first dollar the corporation had earned in 1922.  Suppose in January, a visitor to corporate headquarters, who happened to be a numismatist, noticed that the 1922 dollar has a rare printing error, is a collector's item, and has a value of $1 million.  She communicates such to the company's principals.  Nonetheless, in its valuation on July 1, the company values itself as of December 31 at $1,000,001 rather than $2 million, based on corporate knowledge as of December 31.  Alleging that such a valuation resulted from bad faith is, in my view, non-frivolous.

I also note that the Plaintiffs point out that the Defendants relied on a valuation performed over a week before the LLC agreement contemplated such an exercise being conducted. That in itself may have been a breach of the agreement. In any event, it supports a reasonable inference that the Defendants, knowing that bids for the Midstream Assets would arrive in a few weeks, rushed the valuation so that the Plaintiffs' Units could be redeemed at below fair market value. Such conduct could potentially constitute a violation of the contractual obligation to adjust the valuation in good faith.[166]

In sum, I cannot say that the Plaintiffs' reading of the LLC agreement's rather complex provisions is frivolous. Thus, because the Defendants[167] were aware at the time of dissolution of the Plaintiffs' non-frivolous claims against the LLCs for breach of contract, the LLC Act required creation of a reserve to cover the Plaintiffs' claims. It is undisputed that the Defendants failed to do that. Accordingly, the LLCs were dissolved in violation of Section 18-804(b)(1), and the certificates of cancellation shall be nullified.[168]

---

[166] The Plaintiffs have also introduced evidence suggesting that in early December 2010, Reed, Ferris, and Wallace were considering a plan to "[m]aximize [the] dilutive effect of issuing [a] new series [of units]." Cady Aff. Ex. 10, at 1.

[167] At least Reed and Ferris were aware of the breach of contract claims. Both were high-level officers of LDH whose knowledge may be imputed to the LLCs, which were controlled by LDH. *See, e.g.*, *Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006) ("[I]t is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation.").

[168] *See Laudamiel*, 2012 WL 605589, at *22 n.148 ("[I]f the Court finds that an LLC's affairs were not wound up in compliance with the Delaware Limited Liability Company Act, it may nullify the

36

## III. CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment is granted, and the Defendants' Motion for Summary Judgment is denied. The parties should submit an appropriate form of order, and should inform me within one week whether additional issues remain in this Delaware litigation.

---

certificate of cancellation, which effectively revives the LLC and allows claims to be brought by and against it.").